**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **ANTHONY A.D. HALL, M.D.,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. L- 03-CV-90** |
| | § | |
| **ANTHONY J. PRINCIPI, Secretary,** | § | |
| **Department of Veterans Affairs,** | § | |
| | § | |
| **Defendant.** | | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment [Doc. No. 24].

Plaintiff replied to the Motion for Summary Judgment[1] [Doc. No. 28]; however, despite

Plaintiff's numerous attempts[2], no additional supplemental response was properly filed.

## I.  Background

Plaintiff filed his initial complaint with this Court on July 2, 2003, alleging violations of

the Civil Rights Act of 1964 (Title VII) and the Rehabilitation Act of 1973 [Doc. No. 1].

Plaintiff was hired by the Department of Veterans Affairs in May, 1992 and assigned to the

Laredo Veterans Outpatient Facility, a satellite facility of the Audie Murphy Veterans Affairs

Hospital in San Antonio, Texas.  Plaintiff was supervised by Dr. Carlos Flores Vega and alleges

---

[1] The only evidence offered is an order from the Administrative Judge denying Plaintiff leave to amend his charge. Such order evidences Plaintiff's continual problems meeting filing deadlines, but does not assist in the determination of this motion for summary judgment.

[2] On February 17, 2005 – one day before the response was due – the Plaintiff filed a motion for an extension of time to file a response to the motion for summary judgment [Doc. No. 25].  The motion was granted by order of the Court on February 18, 2005. [Doc. No. 26], setting the new deadline to March 10.  On March 10, Plaintiff filed a response to the motion for summary judgment, along with a motion for additional time to file a supplemental response. [Doc. Nos. 27 & 28].  The Court granted the motion for extension of time [Doc. No. 33], setting the new deadline to March 25.  Plaintiff filed his supplemental response late [Doc. Nos. 25 & 26]; the Court struck the supplemental responses from the record as untimely. [Doc. No. 37].  Plaintiff filed two motions for reconsideration [Doc. Nos. 40 & 42]; both were denied by the Court. [Doc. No. 43].

that he was "throughout the entire tenure of [his] employment[, made] a target of Flores Vega's racial, ethnic and anti-semitic [sic] animus." [Doc. No. 1, p. 3].   From 1992 until 2001, Plaintiff states that he was called, among other things, "pinche gringo" and a "gabacho." [Doc. No. 1, p.3].  Periodically, according to the Plaintiff, Flores Vega would make particularly memorable comments, as in 1993 when he commented that Plaintiff was walking towards a barbecue grill "slowly like Jews going to the crismatoria [sic]," or in 1996 at a medical seminar when Flores Vega told the Plaintiff "you jews [sic] never miss the opportunity for a free meal." [Doc. No. 1, p. 3].  In addition to the chronic comments denigrating the Plaintiff's race – in the form of pejorative comments about persons of Anglo heritage – Flores Vega also allegedly made repeated comments regarding Plaintiff's Judaic faith.  Specifically, Flores Vegas supposedly commented several times that "Jews should never have been admitted into Mexico during the holocaust," and that Jews had "too much power and influence." [Doc. No. 1, p. 4].

In addition to Flores Vega's expressions of anti-Semitism, Plaintiff contends that a co-worker, nurse Felicitas Holguin, and a fellow doctor, Barret Hays, frequently expressed their "religious animus" by referring to a social worker as "'jewish [sic] bitch' and the Plaintiff as the 'Jew Bastard.'" [Doc. No. 1, p. 5].

Amidst this environment allegedly rife with racial epithets, a few additional, salient interactions bear mentioning.  In May 1996, Plaintiff had an altercation with Flores Vega in or near the employee restroom.  Accounts of the interaction vary; Plaintiff claims that "the facility administrator (Barret Hays) burst into the bathroom while Plaintiff was relieving himself to demand that Plaintiff attend a staff meeting and to check whether Plaintiff's bathroom break was legitimate." [Doc. No. 1, p. 5].  The Defense's characterization adds the following facts: "[Plaintiff] physically assault[ed] a co-worker who attempted to retrieve a trash can from the

2

restroom [Plaintiff] was occupying in order to control a serious water leak at the clinic. [Doc. No. 24, p.3].  Defendant's Exhibit G to their Motion for Summary Judgment includes a proposed letter of reprimand and a letter of reprimand [Doc. No. 24, Exhibit 4].  In the letter proposing reprimand, the factual basis of which was adopted into the final letter of reprimand, the incident is characterized as follows: "[Plaintiff] was occupying the Sigmoidoscopy restroom.  Without knocking, a co-worker unlocked the restroom door to retrieve a trash can to catch leaking water outside the restroom door.  [Plaintiff] said that [he] was busy and slammed the door in the co-worker's face.  Again the co-worker unlocked the restroom door which [Plaintiff was] occupying [sic].  This time [Plaintiff] reacted by hitting the co-worker in the chest with a closed fist. [Plaintiff is] charged with exhibiting inappropriate conduct by inflicting bodily injury to a co-worker."  [*Id.*]  Though Flores Vega – one of the parties about whom Plaintiff most intensely complains – wrote this proposed reprimand, the Plaintiff had five days to respond and did not. Although a reply was permissible, there is nothing in the record to suggest that failure to respond constituted any sort of admission of guilt, or even admission of the factual allegations made in the proposed letter of reprimand.  It is also noted that Plaintiff did present an oral response. [Doc. No. 24, Ex. 4, unnumbered p. 33(labeled Govt. Exhibit G)[3]].  In addition, Plaintiff described his version of the events in a deposition taken during the investigation of his Equal Employment Opportunity complaint  ("EEO") filed with the Department of Veterans Office of Resolution Management.  The Plaintiff describes two unannounced, uninvited entrances by Mr. Cantu into the one-person bathroom that Plaintiff was clearly occupying.  [Doc. No. 24, Ex. 6, unnumbered p. 26-27].  The second time Mr. Cantu entered, according to the Plaintiff, was a

---

[3] Note: the exhibits to Defendant's Motion for Summary Judgment have a number of different pagination schemes. For the purposes of this order, the page numbers given as "unnumbered" are the page numbers according to the Adobe Acrobat reader, which lists page numbers based on the total number of pages in an exhibit, each of which occupy a separate file.

mere 30-45 seconds after the first time he entered.  As Mr. Cantu came through the door, the Plaintiff, while holding his pants with one hand, "extended [his other] hand straight out in front of [him] and came up toward [Mr. Cantu], came up against his chest, pushed him out of the room, and locked the door." [*Id.* at 26].  Plaintiff explains that water had been leaking outside and caused Mr. Cantu to stumble, which was witnessed by co-workers. [*Id.*].  Both Plaintiff and Mr. Cantu received reprimands as a result of the encounter. [Doc. No. 24, ex. 11, p. 5].

Plaintiff states that he received his second reprimand in August, 1999, due to "a verbal altercation with a Hispanic nurse Felicitas Holguin, who questioned the legitimacy of the Plaintiff's bathroom breaks." [Doc. No. 1, p. 5].  However, the Plaintiff's allegations seem to have conflated two separate events.  On October 12, 1999, Plaintiff was issued a second letter of reprimand due to two specific altercations.

The first occurred on July 8, 1999, when Flores Vega questioned the Plaintiff about his "intentions . . . regarding a number of [his] patients that had been waiting for several hours." Plaintiff, though within earshot of other personnel and patients, protested in a loud voice that he had just seen a difficult case.  These actions gave rise to a charge against the Plaintiff of "exhibiting inappropriate, unprofessional and disrespectful conduct toward a superior." [Doc. No. 24, Ex. 5, unnumbered p. 1].

The second incident which gave rise to the October 12, 1999 reprimand occurred on August 11, 1999.  After a discussion in which Plaintiff expressed his reluctance to employ an "assembly-line" style system in the clinic, Dr. Flores Vega apparently concurred, saying "[g]ood, I am glad that you are thinking that way now."  Plaintiff took umbrage, "screaming and yelling" and stating, among other things, that "if [he] were not doing [his] job [he] wouldn't be here; [Flores Vega] want[s him] to kiss [his] ass and [he won't.]"  This also led to a charge of

"exhibiting inappropriate, unprofessional and disrespectful conduct and language toward a supervisor." [Doc. No. 24, Ex. 5, unnumbered p. 1].

Plaintiff apparently refers to the reprimand of October 12, 1999 when he says "[i]n August 1, 1999 [sic], Plaintiff received a second reprimand because of a verbal altercation with a Hispanic nurse Felicitas Holguin, who questioned the legitimacy of Plaintiff's bathroom breaks." [Doc. No. 1, p. 5].  However, as noted, the letter of reprimand was filed on October 12, 1999, and refers to interactions with Dr. Flores Vega, not Ms. Holguin.

The third set of incidents which gave rise to disciplinary measures – this time a 3-day suspension – occurred on May 24 and 30, 2000.  The first incident seems to be that which the Plaintiff referred to when describing the second reprimand – in his words "an altercation with [Ms.] Holguin, who questioned the legitimacy of Plaintiff's bathroom breaks."  According to the paperwork accompanying the suspension, Ms. Holguin, during a weekly staff meeting, reported that the Plaintiff's patients were being sent home without being seen and suggested the cause was Plaintiff's frequent bathroom trips.  Plaintiff replied "I need to go to the bathroom frequently because my problem is urgent and if you don't believe me, then follow me and I will leave the door open so you can see me." [Doc. No. 25, Ex. 5].  After Ms. Holguin declined, stating that the comments were unprofessional and uncalled for, Plaintiff laughed and exclaimed "I love it!  I love it!" [Doc. No. 25, Ex. 5].

Then, on May 30, 2000, after informing a nurse – Ms. Marta Gutierrez – that he had a patient in the office but needed to use the restroom, the Plaintiff returned from the restroom and allegedly informed Ms. Gutierrez that he had finished his business and it was available for inspection by Ms. Gutierrez's boss (Ms. Holguin) should she care to examine it. [Doc. No. 24, Ex. 5].

Plaintiff was charged with exhibiting "inappropriate, unprofessional and disrespectful conduct toward a co-worker," and a fourteen day suspension was proposed.  However, due to "the evidence of record and the information [Plaintiff] presented in [his] oral and written responses," the suspension was reduced to three days. [Doc. No. 24, Ex. 5].  Plaintiff's defense to the charge amounted to the following: in incident one, Plaintiff's response was "prompted by the fact that Ms. Holguin's statement . . . publicly embarrassed and humiliated [him]."  In the second incident, Plaintiff denied ever having made the alleged comment.[4]

Not long after the suspension, on September 3, 2000, Plaintiff filed a Complaint of Employment Discrimination with the Department of Veterans Affairs Office of Resolution Management. [Doc. No. 24, Ex. 3].  Plaintiff alleged discrimination on the basis of race, national origin, age, and disability. [*Id*].  Plaintiff averred that he had been harassed since the beginning of his employment, was the target of repeated racial slurs, and was unjustly suspended for his part in an altercation that he said was the result of provocation on the part of co-workers. [Doc. No. 24, Ex. 3, unnumbered p. 2-3].  Age was subsequently dropped as a basis for the complaint. On October 12, 2001, Plaintiff amended his complaint to include allegations of reprisal for his prior EEO activity, namely, the filing of the Complaint with the Department of Veterans Affairs Office of Resolution Management on September 3, 2000. [Doc. No. 24, Ex. 3, unnumbered p. 25].  Plaintiff alleged that he was both denied special pay and charged leave without pay in retaliation for his filing of an EEO claim.  In addition, Plaintiff suggests that discrimination based on religion provided an additional basis for the improper assessment of leave without pay. Plaintiff also added a reprisal-based claim alleging a hostile work environment, as manifested by a supervisor "express[ing] herself in anger and rage." [Doc. No. 24, Ex. 1, unnumbered p. 25-

---

[4] In the letter announcing the suspension, however, Director Coronado pointed out that "there is no evidence to suggest that Ms. Gutierrez would have fabricated the encounter she had with [Plaintiff] on May 30, 2000." [Doc. No. 24, Ex. 5].

26].  Plaintiff was subsequently terminated from his position with the VA clinic on October 29, 2002 for "using his position for private gain and for his repeated tardiness." [Doc. No. 24, p. 4].

In an undated decision [hereinafter "Report"], signed on April 3, 2003 by Charles R. Delobe, Director of the Office of Employment Discrimination Complaint Adjudication, the Department of Veterans Affairs concluded that "the complainant failed to establish by a preponderance of the evidence that he was discriminated against with regard to the claims raised in this complaint." [Doc. No. 24, Ex. 4, unnumbered p. 26].

After discussing the applicable employment-based law, the Report began by discussing the Hostile Work Environment harassment claim.  After concluding that the conduct did occur (though perhaps not for the reasons the complainant suggests), the Report examined whether the conduct constituted harassment.  Finding that the incidents in question occurred over a period of eight years, that the conduct did not occur to the extent alleged by complainant, and that the conduct was not calculated to be harassing, the Report determined that "none of the conduct complained of consists of harassment within the meaning of Title VII." [Doc. No. 24, Ex. 4, unnumbered pg. 21].  More particularly, the Report stated that "the complainant failed to show that the conduct in question consisted of unwelcome personal slurs or other verbal or physical conduct that was offensive or denigrating or that the conduct was based on his prior EEO activity." [Doc. No. 24, Ex. 4, unnumbered p. 21].  Therefore, "the actions alleged, even if proven by the complainant, are not sufficiently severe or persuasive as to alter his working conditions or to create an objectively hostile work environment."  [Doc. No. 24, Ex. 4, unnumbered p. 21-22].

The Report further noted that, in the absence of direct evidence of harassment, the complainant's allegations were properly analyzed under a disparate treatment analysis.  Finding

that the complainant had established a prima facie case for part of his claim based on race and national origin, the Report similarly concluded that portions of complainant's claims based on reprisal also satisfied the requirements for a prima facie case. [Doc. No. 24, Ex. 4, unnumbered p. 24].

Next addressing disability discrimination, the Report concluded that the complainant had proffered sufficient evidence to suggest he suffered from serious medical conditions (irritable colon and depression), he had failed to provide any "meaningful or persuasive evidence demonstrating that his alleged disabilities affected . . . specific life tasks . . . [which] triggers coverage by the Rehabilitation Act." [Doc. No. 24, Ex. 4, unnumbered p. 25].  Thus the Report concluded that an element of the prima facie case of disability discrimination had not been met. However, "recognizing that the burden to establish a prima facie case is not an onerous one with respect to race, national origin, religion, reprisal and disability," the Report assumed, "for the purpose of further analysis," that the complainant had met his prima facie burden. [Doc. No. 24, Ex. 4, unnumbered p. 26].  However, the Report subsequently found that the "management's" (defendant's) explanation was sufficient and that the complainant failed to satisfy his burden of showing that the reasons proffered by management were pretextual, or that they were motivated by retaliation. [Doc. No. 24, Ex. 4, unnumbered p. 27].  The Report suggested that the complained-of tension at the clinic where complainant worked was not entirely the fault of the management.  Rather, the Report concluded that the complainant "gave as good as he got . . . [and that he] engendered and contributed to a long and irksome history of personality disputes within the clinic, manifested on occasions by his anger and rage directed against employees at staff meetings." [Doc. No. 24, Ex. 4, unnumbered p. 28].  Thus, under a disparate treatment analysis, the Report reached the final conclusion that complainant had not carried his burden of

proving by a preponderance of the evidence that the management's explanations were pretextual and their actions motivated by discriminatory animus. [Doc. No. 24, Ex. 4, unnumbered p. 28].

This lawsuit was filed on July 2, 2003. [Doc. No. 1].

## II.  Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The initial burden, borne by the moving party, requires a showing to the Court of the basis for the motion, as well as an identification of the portions of the record "which [the moving party] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)(citing *United States v. Diebold, Inc.,* 369 U.S. 654 (1962)).

Once a moving party has met its burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In other words, "the party opposing summary judgment 'cannot establish a genuine issue of material fact by resting on the mere allegations of its pleadings.'" *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*  831 F.2d 77, 80 (5th 1987) (citing *Russell v. Harrison*, 736 F.2d 283, 287 (5th Cir.1984)). The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Moreover, as Rule 56 "does not impose a duty on the district court to sift through the record in search of evidence to support a party's

opposition to summary judgment," *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996). When evidence "exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004). Therefore, to satisfy the requirement of *Celotex* that nonmovants "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)), the party opposing the motion for summary judgment must "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence supported their claim." *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994)(citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)). Therefore, if an adverse party completely fails to make a showing sufficient to establish an essential element of that party's case on which they will bear the burden of proof at trial, then all other facts are rendered immaterial and the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322-323.

Hence, the granting of summary judgment involves a three-tier analysis. First, the Court determines whether a genuine issue actually exists so as to necessitate a trial. FED. R. CIV. P. 56(e). An issue is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). Second, the Court must ascertain whether that genuine issue pertains to material facts. FED. R. CIV. P. 56(e). The substantive law of the case identifies the material facts; that is, those facts that potentially affect the outcome of the suit. *Anderson*, 477 U.S. at 248. Third, assuming no genuine issue exists as to the material facts, the Court will decide whether the moving party shall prevail solely as a matter of law. FED. R. CIV. P. 56(e).

### III.  **EEO Report and Summary Judgment**

In support of their motion for summary judgment, the Defendant includes various parts of the two EEO reports and determinations made in this case.  [Doc. No. 24, Ex. B, C].  A Report or Determination from the Equal Employment Opportunity Commission is not binding on a subsequent decision by a District Court: "in Title VII litigation, the district court reviews the evidence de novo, independent of any determination by the EEOC." *Dickerson v. Metro. Dade County*, 659 F.2d 574, 579 (5th Cir. Oct. 1981); *see also Hamilton v. Texas Dep't of Transp,* 206 F.Supp.2d 826 (S.D. Tex. 2001)(An EEOC determination is not binding on a District Court)..  Additionally, "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one." *Simms v. Oklahoma*, 165 F.3d 1321 (10th Cir. 1999); *accord Bynum v. Fort Worth Indep. Sch. Dist.*, 41 F.Supp.2d 641 (N.D. Tex. 1999); *accord Williams v. Aviall Services, Inc.*, 2003 WL 21018567 (N.D.Tex. Feb. 12, 2003).

However, Reports from the EEOC are "admissible for the purpose of deciding a motion for summary judgment." *Radcliff v. Wal-Mart Stores, Inc.*, 2002 WL 1042116 at *1 n. 1(N.D. Tex. May 21, 2002); *accord Bynum,* 41 F.Supp.2d; *accord Sanders v. Sybra, Inc.* 2002 WL 220062 (N.D.Tex Feb. 11, 2002).

 The Report issued in this case by Charles R. Delobe, Director of the Office of Employment Discrimination Complaint Adjudication, the Department of Veterans Affairs, is sufficiently similar to the EEOC Determinations in the above-referenced cases to qualify as persuasive, though not dispositive, summary judgment evidence.  Indeed, "the principle which should guide the court's analysis of Title VII cases is that there is to be a fresh determination of the facts and issues by the district court." *Weakhee v. Perry*, 587 F.2d 1256, 1263 (D.C. Cir.

1978); *see also Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972)("civil litigation at the district court level clearly takes on the character of a trial de novo, completely separate from the actions of the EEOC.")

## IV.  Exhaustion of Administrative Remedies

Before seeking redress under Title VII in a district court, a complainant must file an administrative complaint. *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995)(citing *Ray v. Freeman*, 626 F.2d 439, 442 (5th Cir. 1980)).  However, a Title VII cause of action "may be based not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." *Fine v. GAF Chemical Corp.*, 995 F.2d 576, 578 (5th Cir. 1993)(quoting *Fellows v. Universal Restaurants, Inc.*, 701 F.2d 447 (5th Cir. 1983)).

The Defendant argues in his motion for summary judgment that the Plaintiff's addition of two "matters" – the complaint of his termination and that he was not allowed to use sick leave after he underwent surgery – in the filing of his district court complaint exceeded the scope of the EEO investigation to an impermissible degree. [Doc. No. 24, p. 7].  He avers that the Plaintiff "attempts to raise issues which occurred after the filing and amending of his Administrative Complaint, and which were not adjudicated through the administrative process." [Doc. No. 24, p. 7].  Citing *Dollis*, the Defendant concludes that "it would not be reasonable to expect an investigation over these charges [in the lawsuit] to cover Hall's termination and leave issue which transpired one year later." [Doc. No. 24, p. 8].

However, "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary

jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981).  There are both practical and policy reasons for this system; first, "it is the nature of retaliation claims that they arise after the filing of the EEOC charge." *Id.*  Any alternative would require duplicate filings at the time of the original filing, a process which would only serve to add needless paperwork and require either clairvoyance or speculation on the part of the complainant. *Id.* Second, "[e]liminating this needless procedural barrier will deter employers from attempting to discourage employees from exercising their rights under Title VII." *Id.*

The Plaintiff filed his complaint with the EEO within the specified time period and therefore any claims arising out of that complaint are properly before the Court.  Additionally, according to the *Gupta* doctrine, the Court properly exercises ancillary jurisdiction over any claims based on reprisal or retaliation.  The Plaintiff's claims are either derived from his initial administrative complaint, or based on a charge of retaliation or reprisal; therefore, the Court has jurisdiction over the totality of the claims.

## V.  Plaintiff's Claims

### A.  Rehabilitation Act

To qualify for relief under section 504 of the Rehabilitation Act, a plaintiff must prove that "(1) he is an "individual with a disability"; (2) who is "otherwise qualified"; (3) who worked for a 'program or activity receiving Federal financial assistance'; and (4) that he was discriminated against 'solely by reason of her or his disability.'" *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (*citing* 29 U.S.C. § 794(a); *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir.1993)).  An individual with a disability is a person who "(1) has a physical or mental impairment "which substantially limits one or more of such a person's major life

activities"; (2) has a 'record' of such an impairment; or (3) is regarded as having such an impairment." *Id*. (*quoting* 29 U.S.C. § 706(8)(B) (West Supp. 1997)).

Defendant seeks summary judgment on the basis that Plaintiff's irritable bowel syndrome is not a disability because it does not substantially limit one or more of Plaintiff's major life activities, in this case - employment.  In order to qualify as a disability, "[t]he impairment must substantially limit employment generally, 'not simply a particular job.'"  *Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992).  "The inability to work at the specific job of one's choosing is not a substantial limitation on a major life activity."  *Hileman*, 115 F.3d at 354 (citing *Byrne*, 979 F.2d at 565; *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir.1989)).  However, "[a] physical or mental impairment that affects the claimant's ability to engage in a narrow range of jobs only or a particular job alone does not 'substantially limit' one or more major life activities.'"  *Hileman*, 115 F.3d at 353, 354 (*citing Chandler*, 2 F.3d at 1392; *Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1249 n. 3 (6th Cir.1985); *accord Byrne v. Board of Educ.*, 979 F.2d at 565; *Elstner v. Southwestern Bell Tel. Co.*, 659 F.Supp. 1328, 1343 (S.D.Tex.1987), aff'd, 863 F.2d 881 (5th Cir.1988)).  "Whether an impairment substantially limits a plaintiff's employment potential depends upon the number and types of jobs from which he is disqualified, the geographic area to which he has reasonable access, and his employment qualifications."  *See Chandler*, 2 F.3d at 1392 (citing Jasany, 755 F.2d at 1249).

In the instant case, Plaintiff has failed to present any summary judgment evidence as to the types of jobs from which he is disqualified, the geographic area to which he has reasonable access, and his employment qualifications.  In fact, Plaintiff has offered no summary judgment evidence on the issue of disability in general or as to his irritable bowel syndrome in particular. However, Defendant's summary judgment evidence establishes that "when it [ the "irritable

colon"] is severe, it makes [Plaintiff] unable to do his work."   [Doc. No. 24, Govt. Exhibit L, p.

75).  Additionally, Plaintiff's doctor described Plaintiff's symptoms as  "tiring and debilitating

for both work and social events."  *Id*. at 77. Such evidence wholly fails to establish that Plaintiff

suffers from a physical impairment which substantially limits one or more of his major life

activities.  As noted elsewhere, Rule 56 "does not impose a duty on the district court to sift

through the record in search of evidence to support a party's opposition to summary judgment."

Because Plaintiff has failed to raise a genuine issue of material fact to establish that he is

entitled to the protections of the Rehabilitation Act, the Court GRANTS Defendant's motion for

summary judgment on Plaintiff's Rehabilitation Act claims.

### B.  Title VII Claim

#### 1.  The *McDonnell-Douglas* Burden-Shifting Framework

The initial burden in a Title VII discrimination claim is borne by the plaintiff.  In order to

fulfill that burden, the plaintiff may prove his claim "either through direct evidence, statistical

proof, or the test established by the Supreme Court in *McDonnell Douglas Corp.  v. Green*, 411

U.S. 792, 800 (1973)." *Urbano v. Continental Airlines*, 138 F.3d 204, 206 (5th Cir. 1998).

Direct evidence is evidence which, if believed, proves the fact without inference or

presumption.  *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (*citing*

*Burns v. Garden State Cmty. Coll.*, 908 F.2d 1512 (11th Cir. 1990)).  Once "a plaintiff presents

credible direct evidence that discriminatory animus in part motivated or was a substantial factor

in the contested employment action, the burden of proof shifts to the employer to establish by a

preponderance of the evidence that the same decision would have been made regardless of the

forbidden factor."  *Brown*, 989 F.2d at 861 (5th Cir. 1993) (*citing Price Waterhouse v. Hopkins*,

490 U.S. 228 (1989)); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)

("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination . . . . The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence."") (*quoting Leob v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979).

In *Brown*, the Fifth Circuit found that a supervisor's routine use of the word, "nigger," was direct evidence of discriminatory intent because it reflected the supervisor's racism. *Id.* The Fifth Circuit clarified that unlike certain comments that are "too vague to constitute direct evidence of discrimination," the term, "nigger [is a] universally recognized opprobrium, stigmatizing African-Americans because of their race." *Id.* The Fifth Circuit further noted that such racism infected the adverse employment actions suffered by the plaintiff because the supervisor "directly participated" in those actions. *Id.*

In *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994), the Fifth Circuit found that evidence reflecting sex bias could constitute direct evidence of discrimination. Examining the prior Supreme Court decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 270-71 (1989), the Fifth Circuit noted that comments by partners describing a female partnership candidate as "macho," saying that "[she] overcompensated for being a woman," advising female partnership candidate to "[take] a course in charm school," and advising female partnership candidate to "walk more femininely, talk more femininely, dress more femininely . . . and wear jewelry" were direct evidence of gender discrimination. *Davis*, 14 F.3d at 1085 (*discussing Price Waterhouse v. Hopkins*, 490 U.S. 228, 270-71 (1989) (O'Connor, J., concurring)). The Fifth Circuit held that "these comments directly suggest the existence of bias; no inference is necessary" *Id.*

16

In the instant case, Plaintiff contends that the terms "gringo and "gabacho" were constantly used in reference to him and that such terms show a racial animus.  Although the term "gringo" is usually disparaging (*Random House Webster's Unabridged Dictionary*, 841 (2nd Edition)) it is not a term that necessarily suggests the existence of bias[5], without need for any inference.  The term "gabacho" is a slang word sometimes used to refer to English-speaking non-Hispanics.[6]  However, even considering this evidence in the light most favorable to Plaintiff, as the Court must, this Court is unpersuaded that such terms constitute direct evidence of discrimination.

Therefore, reference to the *McDonnell Douglas* burden-shifting network is necessary. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  Thus, the plaintiff "must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thereby creating a rebuttable presumption of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000).  Once a prima facie case has been established by the plaintiff, the burden shifts to the defendant to "rebut the presumption of discrimination by producing evidence . . . of a legitimate, nondiscriminatory" motive.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  If the defendant meets this burden, the "mandatory inference of discrimination" created by the prima facie case is rebutted; the burden returns to the plaintiff, who must demonstrate that the defendant's proffered reason for discrimination is mere pretext. *McDonnell Douglas*, 411 U.S. at 804.  In evaluating the

---

[5] The term is sometimes used in business establishments, as in "Dos Gringos Bar" in Fort Worth.  *See Whitmore v. State*  570 S.W.2d 889, 890 (Tex. Crim. App.1976).

[6] "Pejorative term used to refer generally to native people of northern regions who speak the national language badly. Often used nowadays in Mexico to refer to people and things related to or coming from the United States . . . . Etymology:  Originally, since 1530, the name Gabacho was applied to French people. It comes from the word *gavach* in Occitan which means rude mountain dweller or native of a northern region who speaks the national language badly.  The word's strictest meaning is bird's crop or goiter, applied to the mountain dwellers in the northern Occitan-speaking zones due to the frequency of the disease in this population."  Retrieved from "http://en.wiktionary.org/wiki/Gabacho"

plaintiff's attempt to meet his burden on the ultimate question, the factfinder, in addition to considering evidence that the employer's reasons were pretextual, "may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . .'" *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)(quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)).  Throughout the sequence of burden-shifting, however, the plaintiff retains the ultimate burden of persuasion. *Burdine*, 450 U.S. at 256.

### 2. <u>Prima Facie Discrimination – Disparate Treatment</u>

To establish a prima facie case of racial discrimination by disparate treatment, through use of circumstantial evidence, a plaintiff must prove that "(1) he belongs to a protected group; (2) he was qualified for the position sought; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class." *Price v. Federal Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002); *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003).

The Defendant asseverates that the Plaintiff failed to make his prima facie case because he could not show that he had suffered an "adverse employment action,"[7] the meaning of which is strictly construed by the Fifth Circuit to include only "ultimate employment decisions" rather than "every decision made by employers that arguably might have some tangential effect upon these ultimate decisions." *Dollis*, 77 F.3d at 781-82; *see also Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 878 (5th Cir. 1999)("Our court has analyzed the 'adverse employment action' element in a stricter sense than some other circuits.").  The Defendant is able to support this assertion by disqualifying the fact of Plaintiff's termination as outside the

---

[7] Defendant appears to presume that Plaintiff can meet the first and second prongs of the framework set forth in *Price* and *Manning*.

jurisdiction of this Court due to Plaintiff's failure "to exhaust his administrative remedies in that regard." [Doc. No. 24, p. 11].  Defendant does allow, however, that Plaintiff's three-day suspension may rise to the level of an adverse employment action.  However, the Court need not decide if the suspension is sufficient to constitute an adverse employment action, as the fact of the termination is properly within the jurisdiction of the Court.[8]  The termination unquestionably constitutes an adverse employment action, thereby eviscerating the Defendant's argument in this regard.

However, though Plaintiff did suffer an adverse employment action, in order to construct a prima facie case he must also prove that he was replaced by someone outside the protected class. Plaintiff failed not only to prove, but to even allege, that he was replaced by someone outside the class.  Therefore, because Plaintiff has failed to provide direct evidence of discrimination or to provide sufficient circumstantial evidence to successfully navigate the first stage of the *McDonnell Douglas* reticulation, his claims of discrimination based on disparate treatment fail.

However, even if the Plaintiff had alleged sufficient facts to make out a prima facie case, his claims of disparate treatment discrimination would fail.  Assuming *arguendo* that Plaintiff did make out a prima facie case, the burden would shift to the Defendant to "rebut the

---

[8] In *Zaffuto v. City of Hammond*, 308 F.3d 485 (5th Cir. 2002), the Court considered a 10-day suspension as potentially an adverse employment action.  In the context of a prima facie case of retaliation, the Court declined to decide if the 10-day suspension constituted an adverse employment action, instead disposing of the retaliation claim on the basis that the record failed to establish "a causal relation between the protected activity and the alleged retaliation." *Id.* at 493.

It is also worth noting that the Fifth Circuit has "also implied that the continuing vitality of the 'ultimate employment decision' doctrine is questionable in the light of *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)." *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002); *see also Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 192 (5th Cir. 2001)("*Burlington Industries* and *Faragher* are noteworthy in the context of this court's 'ultimate employment decision' doctrine because the Supreme Court sets out a relatively broad definition of 'tangible employment action': 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'".).  However, as noted in *Felton*, *Dollis* remains the "one clear pronouncement on the matter." 315 F.3d at 487.

presumption of discrimination by producing evidence . . . of a legitimate, nondiscriminatory"

motive. *Burdine*, 450 U.S. at 254.  Defendant contends that Plaintiff was terminated from

employment with the VA Clinic for "using his position for private gain and for his repeated

tardiness." [Doc. No. 24, p. 4].  The Defendant includes as an exhibit to their Motion for

Summary Judgment the letter from the Department of Veterans Affairs which announced

Plaintiff's discharge.  Charge I, which reads "Using Official Position for Private Gain" notes that

"the STVHCS Director appointed an Administrative Board of Investigation (BOI) to investigate

the possibility of [Plaintiff's] participation in inappropriate prescribing practices."  [Doc. No. 24,

Ex. 5, p. 6].  The BOI Report found that the Plaintiff had indeed been prescribing his own

medication; in addition, Plaintiff admitted as much in testimony before the BOI.  In addition to

"annotat[ing] the prescriptions for up to 11 refills," the Plaintiff also "documented the issuance

of the prescriptions in [his] Employee Medical Folder."  Because he had not filed a claim for

job-related injury or illness, the documentation in the Employee Medical Folder enabled the

Plaintiff to receive the medications – up to 15 different types – free of charge. [Doc. No. 24, Ex.

5, p. 6].

Though such transgressions alone would certainly warrant dismissal, the letter of

dismissal also cited "repeated tardiness" which "impact[ed] the timeliness of providing patient

care." [Doc. No. 24, Ex. 5, p. 6].  Describing numerous instances of tardiness, observed by

multiple people[9], the letter states that the Plaintiff had been previously warned, in counseling

sessions, of the "adverse impact [his] tardiness has in [his] efficiency in providing patient care,

as well as the impact on the remainder of the patient care team." [Doc. No. 24, Ex. 5, p. 6].

---

[9] The letter notes, addressing the Plaintiff in the first person, that "the Administrative Officer, Mr. Adam Mendez,
reported that he personally observed you reporting late for duty on June 18, June 19, and June 20, 2002.  Dr. Homero
Sanchez, Acting Chief Medical Officer has reported that you are often up to 20 minutes late in reporting for duty.
You have been counseled on numerous occasions regarding your tardiness by Dr. Sanchez.  You have told Dr.
Sanchez you were jogging, in response to his inquiry as to why you were late in reporting for duty." [Doc. No. 24,
Ex. 6, p. 7].

The letter of dismissal, which explicitly took into account factors such as the Plaintiff's "years of service, . . . past work record, the seriousness of the offenses . . . and whether there are any mitigating or extenuating circumstances," acknowledges that the "notice of proposed discharge do[es] not involve a question of professional conduct or competence." [Doc. No. 24, Ex. 6, p. 8]. There is little doubt that the Defendant has proffered a reason for the adverse employment action – the dismissal – which amply rebuts the initial presumption of discrimination established by the prima facie case. The burden therefore shifts to the Plaintiff to show that the Defendant's proffered reason was merely pretextual. The Plaintiff has offered no evidence whatsoever to rebut the Defendant's non-discriminatory reason for the allegedly discriminatory action.

The Court is cognizant of the fact that in addition to considering evidence that the employer's reasons were pretextual, the factfinder "may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . .'" *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)(quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)). However, even considering his prima facie case – which at best might be considered marginal – the Plaintiff's failure to provide evidence of pretext proves fatal for his claim of disparate treatment discrimination.

### 3. Hostile Work Environment

Regarding a hostile work environment claim, the Supreme Court has held that "[w]hen a workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment," Title VII is violated. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) (citations omitted). For

a successful claim, conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would fine hostile or abusive." *Id*. Moreover, the plaintiff must "subjectively perceive the environment to be abusive" for a hostile work environment claim. *Id*. at 21-22.

To survive summary judgment on a hostile work environment claim, the Plaintiff must show a fact issue on each of the following elements: "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000).

The Plaintiff in his original petition and his response to Defendant's motion for summary judgment, gives abbreviated versions of several acrimonious encounters he had with co-workers during his employment. However, the Plaintiff has failed to provide any summary judgment evidence which the Court can consider in evaluating the motion for summary judgment motion. As previously noted, "the party opposing summary judgment 'cannot establish a genuine issue of material fact by resting on the mere allegations of its pleadings.'" *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc*. 831 F.2d at 80. Furthermore, Rule 56 "does not impose a duty on the district court to sift through the record in search of evidence to support a party's opposition to summary judgment," *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463. Nonetheless, the Court has considered the evidence presented by Defendant to determine whether a fact issue exists.

The majority of such evidence, ironically, comes by way of the exhibits attached to the Defendant's Motion for Summary Judgment. In particular, Government Exhibit L, Examination Under Oath of Dr. Anthony Alton Darwin Hall, supports several of Plaintiff's claims with minor discrepancies. Plaintiff Hall testified that Dr. Flores Vega said, "You are as quiet as a Jew

22

walking to a gas chamber." [Dkt. No. 24, Ex. L at 43]. This testimony, while not a precise recantation supports Plaintiff's claim that Dr. Flores Vega "stated that Plaintiff was walking towards a barbecue grill "slowly like the Jews going to the crismatoria" [sic] during the holocaust." [Dkt. No. 1 at 3]. Plaintiff Hall's claim that he was called, "pinche gringo" and "gabacho" from 1992 to 2001 is also supported by the testimony of Plaintiff. [Dkt. No. 24, Ex. L at 3, 5, 8, 9, 79].  Plaintiff's testimony also supports the claim that Dr. Flores Vega said "you jews never miss the opportunity for a free meal." [Dkt. No. 24, Ex L at 9]. The Court does not find support for Plaintiff's unverified allegation that Dr. Flores Vega "commented that Jews should have never been admitted into Mexico during the holocuast," nor does the Court find support for Plaintiff's claim that Dr. Flores Vega was heard "commenting about the stereotype that Jews had too much power and influence." [Dkt. No. 1 at 4]. (quotations omitted).

However, despite the fact that Plaintiff offered no pertinent summary judgment evidence, and considering the evidence offered by Defendant in the light most favorable to the Plaintiff, the Court finds that the alleged displays of racial and religious bigotry do not rise to the level of a hostile or abusive work environment.  The factors used to determine whether an environment is "hostile" or "abusive" are: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliated, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.  The handful of instances of offensive conduct by Dr. Flores Vega coupled with the occasional use of racial slurs does not constitute a workplace permeated with discriminatory intimidation, ridicule, and insult.  The conduct of which Plaintiff complains is not severe, but rather the occasional use of racially insensitive terms, which Plaintiff understood for a time to be "in a joking way."  [Dkt. No. 24, Ex. L at 5].  Furthermore, Plaintiff was employed over a ten year period and Plaintiff has

not provided proof that these comments were more than infrequent during those ten years.

Because the conduct of the Defendant was not severe and because it was not frequent, the Court

GRANTS summary judgment in favor of the Defendant on Plaintiff's hostile work environment

claims.

**Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in

its entirety and Plaintiff's claims are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DONE on this 3rd day of April, 2006, at Laredo, Texas.


_____
                Micaela Alvarez
        UNITED STATES DISTRICT JUDGE


**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS NOTICE SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**